No. 80-350

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

STATE OF MONTANA, Department of
Livestock,.

Petitioner and Appellant,

-vs-

SAND HILLS BEEF, INC.,

Respondent and Respondent.

Appeal from: District Court of the Thirteenth Judicial Disrict,
In and for the County of Big Horn, The Honorable
Diane G. Barz, Judge presiding.

Counsel of Record:

For Appellant:

James E. Seykora, Special Asst. Atty. General,
Hardin, Montana ( County Attorney)

For Respondent:

Holmstrom, Dunaway & West, Billings, Montana

Submitted on Briefs: May 8, 1981

Decided: DEC 21 1981

Filed: DEC 21 1981

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The Department of Livestock (Department) appeals from a judgment of the Yellowstone County District Court which ruled that the Department could not recover against Sand Hills Beef, Inc. for its claimed outbreak of scabies, and for supervising the cattle dipping. The issues turn on an interpretation of section 81-2-109, MCA, which permits expenses to be recovered by the Department, but which does not set out the particular expenses recoverable. For reasons stated in this opinion, we affirm the judgment.

The trial court construed section 81-2-109 as a penal statute and therefore properly held that it must be strictly construed. Based on this construction, the trial court entered the following rulings, all of which are appealed by the Department:

1. Travel expenses, per diem, and expenses of investigation are not expressly provided for and must be denied. This included a ruling on the Department's rental of an airplane.

2. The statute expressly excepts the salary of the "supervisory officer representing the Department," and because all of the personnel present from the Department were acting in a supervisory capacity, their salaries and expenses were not recoverable under the statute. We affirm the ruling but on different grounds.

Sand Hills Beef, Inc. (Sand Hills) is a Nebraska corporation engaged in the production and sale of cattle. In the spring of 1979, Sand Hills entered into a contract for the use of grazing land located on the ranch of Jack Owens, in Bighorn County, Montana. Sand Hills then made arrangements for shipping approximately 4,100 head of cattle

-2-

from their feedlot in Mitchell, Nebraska, to the Jack Owens ranch. Sand Hills personnel charged with making the arrangements for this shipment operated under the mistaken belief that the Owens ranch was located in Wyoming. Actually, the ranch lies several miles north of the Wyoming border in Montana. Pursuant to this mistaken belief, Sand Hills complied with the Wyoming livestock and health laws and regulations, including obtaining brand papers, brand inspections, health inspections, and dipping the cattle before shipment. The cattle were dipped for scabies (a communicable disease affecting cattle) before their shipment into Montana. During the early spring of 1979, the shipment of the 4,100 head of cattle to the Owens ranch was completed.

In late April or early May, the Department became aware of the fact that cattle had been brought into the state without the proper health certificates, import permits, and notification required by Department regulations. (Section 32.3.205 A.R.M.) After further investigation revealed that the cattle had originated from an area in Nebraska where scabies had been a problem, the Department acted immediately to enforce compliance with Montana laws and regulations. These regulations, among other things, required that all cattle, upon being brought into the state, be dipped for scabies under Department supervision. This requirement exists notwithstanding the fact that the cattle (as in this case) may have been dipped before shipment. The Department assigned three employees to supervise the quarantine and dipping of the Sand Hills cattle. A quarantine order was issued and delivered to the president of Sand Hills on May 30, 1979. Later, Sand Hills pleaded guilty to a misdemeanor offense of import violation in justice court in Bighorn County.

After being informed of the mistake as to the location of the Owens ranch, Sand Hills cooperated fully with the Department in the quarantine and dipping of the cattle. Sand Hills provided the dipping tank, all of the equipment, chemicals, and personnel necessary to perform the actual dipping operation at an expense to them of about $11,000. Department personnel were on hand to supervise the procedure: Dr. Glosser, the state veterinarian and head of the Department was the overall supervisor on behalf of the state; E. E. "Cork" Mortensen, the supervisor of the import-export section of the Department, was present to observe the actual dipping of the cattle; Ron Reed, district inspector for the brand enforcement division of the Department was also present for the purpose of counting the cattle to insure that all of them were treated. All three men had participated in the investigation of the import violation and in the supervision of the quarantine order issued on May 30.

Dipping, under the supervision of the Department, started on June 12, and continued through June 19, 1979. The Department, without the knowledge of Sand Hills, chartered a private airplane to fly over the Owens ranch to assure that all of the cattle had been rounded up, and to determine whether any other local cattle had been exposed to the Sand Hills cattle. But Sand Hills personnel actually rounded up all the cattle and performed all of the actual labor related to the dipping operation. After the dipping process was completed on June 19, the Department issued a "press release" stating that the import violation and possible scabies threat had been cured.

The Department then sent a bill to Sand Hills demanding reimbursement for the following claim:

| 1. | Two investigator's salaries plus benefits (Salaries of Mortensen and Reed) | | $3,282.32 |
|---|---|---|---|
| 2. | Travel and per diem (For Mortensen, Reed and Glosser from May 30 through June 21, 1979) | | 2,145.48 |
| 3. | Airplane rental | $1,098.10 | |
| | Services of pilot | 364.28 | 1,462.38 |
| | TOTAL | | $6,890.18 |

The statute providing for expenses, section 81-2-109, MCA, provides:

"81-2-109. Expenses, how paid--lien and foreclosure. The expenses of inspecting, testing, supervision of quarantine, supervision of dipping, supervision of disinfection, and supervision of other treatment of diseased or exposed livestock by the department and the sanitary inspection of dairies, packinghouses, meat depots, slaughterhouses, milk depots, and other premises shall be paid for by the department. However, the owner of the livestock or property is liable for all expenses, except the salary of the supervising officer representing the department, when the owner, agent, or person in charge of the livestock or property has violated the rules of the department. These expenses are a lien on the livestock or other property, and the department may retain possession of the livestock until the charges and expenses are paid. The lien is not dependent on possession and may be foreclosed in the name of the agent in the department by sale at public auction of the stock or as many as may be necessary to pay the sum of the costs, after 10 days' notice by posting in three public places in the county. The lien may also be foreclosed by an action in a court of competent jurisdiction against the owner of the livestock to recover the amount of charges and expenses."

The Department later adjusted its statement to $6,755.57. This adjustment came about because the Department eliminated a claim for the pilot's services, but also added a claim for $218.57 as being the "claims of Bighorn County." Sand Hills believed that this claim for reimbursement contained not only irregularities but claims that could not be allowed. It refused to pay according to the demand, but apparently in an effort to release the lien on the cattle, which is provided by statute, Sand Hills deposited $6,754.57 with the Bighorn County Clerk of Court to satisfy any possible claims for expenses.

On May 30, 1980, the Department filed suit to collect for its claimed expenses incurred in the cattle dipping

operation. At the hearing on July 22, 1980, counsel for Sand Hills, in cross-examining the Department's witnesses, demonstrated a number of improper claims which the Department had charged to Sand Hills. The trial court denied all of the Department's claims and this appeal followed.

The Department argues that the phrase "all expenses," as used in the second sentence of section 81-2-109, MCA, must be interpreted liberally to allow recovery of any expenses which the Department sees fit to recoup. The Department ignores, however, the well-known common law and statutory rule that particular expressions will qualify and define those which are general. Burke v. Sullivan (1954), 127 Mont. 374, 265 P.2d 203, 205; section 1-3-225, MCA (as recodified, in existence since 1891). Therefore, the phrase "all expenses" must be limited to those expenses particularly described in the first sentence of the statute.

The Department may recover only those expenses which are directly related to one or more of the activities applied here, the activities falling within the statute are "supervision of quarantine" and "supervision of dipping." An expense not directly related to these prescribed activities cannot be recovered.

Section 81-2-109, MCA, although not a criminal statute, imposes a liability upon private individuals for the violation of governmental rules, and is in essence a penal statute. The test in determining whether or not a statute is penal in nature is "whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual . . ." Huntington v. Attrill (1892), 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123. Here the Department seeks to redress a violation of Department rules which are clearly public in nature.

-6-

Accordingly, section 81-2-109 is properly viewed as a penal statute to be strictly construed. We have stated: "This court is committed to the wholesome and generally recognized rule that statutes imposing burdens, either _civil_ or criminal, upon the citizens must be clear and explicit." State v. Nagle (1935), 100 Mont. 86, 45 P.2d 1041. (Emphasis added.) The Department may not recover expenses unless it affirmatively shows that such expenses are clearly within the purview of the statute. We proceed then to the individual claims.

EXPENSES OF INVESTIGATION

Section 81-2-109, MCA, does not mention recovery of expenses incurred by the Department during the course of an investigation of a possible import violation. Strict construction demanded of penal statutes require a holding that the investigatory expenses charged to Sand Hills are not recoverable under this statute.

TRAVEL AND PER DIEM

The Department attempted to charge Sand Hills for the travel expenses and per diem incurred by three of its employees from May 30 through June 21, 1979. This period encompasses the "investigation," quarantine, and dipping, and several days after the dipping of the cattle was completed. Because the actual dipping took place from June 12 through June 19, it is obvious that the travel expenses and per diem charged to Sand Hills went well beyond those dates. In fact, there was no showing at trial as to what expenses were properly or reasonably incurred while the Department was actually engaged in the supervision of the cattle dipping.

The concept of "expense," even as it is strictly construed under section 81-2-109, MCA, may properly include travel and per diem expenses. Nonetheless, it is the burden of the

-7-

Department to show that the expenses were reasonable and necessarily related to the activities defined in the first sentence of section 81-2-109. The Department has not met this burden.

THE AIRPLANE EXPENSES

The Department may conceivably have compelling reasons to rent a private airplane in the course of supervising a quarantine issued by the Department. If it is shown that incurring such an expense is the only effective method of supervising the quarantine, the expense would be properly recoverable under section 81-2-109, MCA. There was no such showing here.

Testimony of the Department's witnesses establishes that, after the imposition of the quarantine on May 30, 1979, Sand Hills cooperated fully with the Department. Sand Hills knew the exact number of cattle subject to the quarantine, and Sand Hills employees promptly began to round them up for dipping. Despite this cooperation, the Department made no effort to determine the total number of cattle to be dipped. Rather than counting each animal as it was dipped, and then segregating them from the untreated animals, and then comparing that count with the total number of animals illegally brought into the state, the Department chose instead to rent an airplane to determine that all of the animals had been rounded up for dipping. The Department offered no evidence to show that the size of the ranch or the immediacy of the situation prevented the Department from performing its supervisory duties in a less expensive way. The ruling of the trial court denying the airplane expense is affirmed.

## SALARY OF "SUPERVISING OFFICER"

Section 81-2-109, MCA, expressly precludes recovery of the salary of the "supervising officer" representing the Department. Use of "officer" rather than "officers" clearly indicates that only one such employee may be deemed as the "supervising officer." In fact, before the amendment of this statute in 1974, the statute prohibited the recovery of the salary of the "supervising officer or officers." The amendment which deleted "or officers" indicates a legislative intent to limit this exclusion to one employee of the Department.

Here the "supervising officer representing the department" was Dr. Glosser. Therefore, the portion of the salaries of Reed and Mortensen relating directly to their time spent supervising the quarantine and dipping of Sand Hills cattle, should be recoverable. The Department did not, however, adequately show the precise number of hours that these employees spent in the course of supervising the quarantine and cattle dipping.

The record further demonstrates carelessness and over-reaching on the part of the Department in computing the expenses charged to Sand Hills. For example, the Department attempted to recover exact payment for expenses incurred during the "investigation" of the import violation. The statute does not allow recovery for this expense. One of the claimed expenses involved sending the Bighorn County Attorney and an undersheriff to Nebraska. The propriety of necessity of such a trip was never established at trial. Dr. Glosser testified that the Department charged Sand Hills for his expenses incurred while attending a Bighorn County

Livestock Association meeting.  This meeting was unrelated to any of the Department's duties described in section 81-2-109, MCA.

In addition, Department witnesses testified that some of their time for which the Department billed Sand Hills was spent on matters entirely unrelated to the Sand Hills affair. Mortensen testified that he was uncertain how many of his hours charged to Sand Hills were directly related to the actual supervision of quarantine and dipping.

It is clear that although a part of the salaries of Mortensen and Reed should be recoverable, the carelessness of the Department has made recovery impossible.  We therefore, again affirm the ruling of the trial court.

The record demonstrates extreme carelessness by the Department in reviewing the expenses charged to Sand Hills. Many of the expenses were patently not within section 81-2-109, and many others were questionable.  Nor was there any attempt by the Department to categorize the expenses so that Sand Hills, or the trial court, could intelligently review them. Instead, the Department in effect shotgunned its expenses and made a naked demand for payment.

The order of the District Court denying all expenses is affirmed.

_____
                Justice

We Concur:

_____
      Chief Justice

_____

_____

_____
            Justices

-10-