No. 02-521

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 280

WARREN G. HARDING and GRACE HARDING,

Plaintiffs and Respondents,

v.

BARBARA G. SAVOY, et al.,

Defendant and Appellant.

ORVILLE E. SKOGEN and ARLENE F. SKOGEN,

Plaintiffs, Cross-Appellants and Respondents,

v.

BARBARA B. SAVOY, et al.,

Defendant and Appellant.

ORVILLE E. SKOGEN and ARLENE F. SKOGEN,

Plaintiffs, Cross-Appellants and Respondents,

v.

BOB MURRAY, JR., et al.,

Defendant and Appellant.

APPEAL FROM:     District Court of the Eighth Judicial District,
                 In and for the County of Cascade, Cause Nos. CDV 99-1152,
                 CDV 00-742 and CDV 00-804
                 The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Quentin M. Rhoades, Sullivan Tabaracci & Rhoades, Missoula, Montana; James A. Manley, Manley Law Office, Polson, Montana (Attorneys for Appellant Savoy); John P. Poston, Attorney and Law, Helena, Montana (Attorney for Appellant Murray)

For Respondents:

Gary M. Zadick, Ugrin Alexander Zadick & Higgins, Great Falls, Montana (Attorney for Respondent Skogen); Robert B. Pfennigs and Brion C. Lindseth, Jardine Stephenson Blewett & Weaver, Great Falls, Montana (Attorneys for Respondent Harding)

Submitted on Briefs:  June 19, 2003

Decided:  October 14, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Barbara B. Savoy (Savoy) and Bob Murray, Jr. (Murray), defendants and appellants, appeal from the Findings of Fact and Conclusions of Law entered by the Eighth Judicial District Court, Cascade County, quieting title in favor of the plaintiffs and respondents, Warren G. Harding and Grace Harding (Hardings) and Orville E. Skogen and Arlene F. Skogen (Skogens), and awarding plaintiffs treble damages pursuant to Montana's forcible detainer statute, § 70-27-103, MCA. Hardings and Skogens cross-appeal the District Court's denial of their claims for fees. We affirm.

¶2     We address the following issues on appeal:

¶3     1. Did the District Court err in awarding treble damages for forcible detainer?

¶4     2. Did the District Court err in its award of the money judgment?

¶5     3. Did the District Court err in finding a prescriptive easement in favor of Skogens across Murray's Lot 13?

¶6     4. Did the District Court err in its findings regarding the movement of the Sun River in the disputed areas?

¶7     5. Did the District Court err in denying Hardings' and Skogens' claims for attorney fees?

**BACKGROUND**

¶8     The complaints in this quiet title and forcible detainer action, Skogens against Savoy and Murray, and Hardings against Savoy, were filed in 1999 and 2000. The complaints were later consolidated by stipulation of the parties. The District Court conducted a ten-day bench

3

trial. The facts in this case are lengthy and complicated. We recite here only those facts that may be necessary to an understanding of our decision.

¶9      The Court and the parties referred to the land in dispute between Hardings and Savoy as the "Oxbow." Likewise, the term "Island" referred to the parcel of land in dispute between Skogens and Savoy as well as Skogens and Murray.

¶10     The District Court found a majority of the lands comprising the Oxbow have been owned in fee by Hardings and their predecessors since as early as 1912. The court found that, since 1950, Hardings were in actual, exclusive and continuous possession of the Oxbow property until Savoy destroyed their fence in August/September of 2000. The court found that Hardings had used the Oxbow property for grazing as an integral part of their cattle operation. The fence destroyed by Savoy had been used by Hardings to restrain their cattle from traveling any further than the south end of the Oxbow. Savoy replaced Hardings' destroyed fence with a new fence which precluded Hardings from getting to their water access and forced them to sell their cattle, causing them damage.

¶11     The District Court found that Skogens, owners of the properties comprising the Island, owned such property since July 1987 and have been in actual, exclusive and continuous possession of the Island property from July of 1987 to the time of trial.

¶12     Savoy purchased her property in 1995 from a realtor based upon a brochure, neither of which represented the purchase included river frontage. The brochure described the property as comprising "100.62 acres, more or less." According to a 1906 survey, Lot 7 was approximately 45.68 acres and Lot 6 approximately 39.05 acres. The balance of the property

is contained in the north quarter/southwest quarter of Section 8.

¶13    Immediately upon purchasing the property, Savoy commissioned a survey for the purpose of subdividing Lot 7 with her sister. The survey indicated that Savoy's portion of the subdivided Lot 7 totaled 22.64 acres. The District Court found that Savoy, with the current action, was attempting to increase the size of her portion of Lot 7, at the expense of Hardings, from the 22.64 acres she paid for to 90.82 acres. In addition, she was attempting, at the expense of Skogens, to claim title to all of Lot 5.

¶14    Murray purchased his property in 1975. The dispute between Skogens and Murray involves the location of their east-west boundary fence. Murray's brother-in-law, Warren Latvala, conducted a survey to determine the location of this boundary. Despite the fact Murray knew Skogens disputed the validity of the Latvala survey, Murray removed the existing boundary fence and built a new fence in reliance upon it.

¶15    The District Court made detailed findings based on expert and lay witness testimony, photographs, and eye witness or local resident accounts dating back to the 1940's. It concluded that the Sun River, in the disputed Oxbow and Island areas, has moved by the process of avulsion, which is the abandonment of one river channel and movement to another, bypassing the land so that physical features are recognizable before and after the shift or jump. The court concluded that the Sun River, in the area of the Oxbow, moved or shifted south by the process of accretion from where it was depicted in the 1906 survey, and then in 1916 moved north by avulsion to its new channel, and that the river in the area of the Island moved by avulsion to its new channel north of the Island on June 6, 1948.

5

¶16 The District Court also found that Skogens presented credible evidence demonstrating open, notorious, exclusive, and continuous use over a road on Murray's property for the full, required statutory period. The court thus found that Skogens established a prescriptive easement on the disputed road traversing Murray's property, and that even if Murray or Savoy had any rights to the Island or Oxbow properties respectively, both were barred from asserting those rights by the doctrine of laches.

¶17 The District Court assessed damages in favor of Hardings and against Savoy for Savoy's destruction of Hardings' fence, bulldozing of roads, destruction of access to trees and vegetation, bulldozing of a new fence and denying them access to the Oxbow for grazing and water use. Assessing damages for the above losses and trebling those damages for forcible detainer as provided in § 70-27-206, MCA, the court awarded Hardings damages in the amount of $118,320.00.

¶18 Assessing damages in favor of Skogens and against Savoy, the District Court found that the wrongful acts of Savoy in destroying fences and in denying Skogens access to the Island caused injury, loss, and damages, the trebling of which amounted to $131,100.00.

¶19 Savoy and Murray appeal.

## STANDARD OF REVIEW

¶20    This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Albert v. Hastetter*, 2002 MT 123, ¶ 14, 310 Mont. 82, ¶ 14, 48 P.3d 749, ¶ 14 (citation omitted). Additionally, in determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party. *Albert*, ¶ 14. We review a district court's conclusions of law to determine whether those conclusions are correct. *Albert*, ¶ 14.

## DISCUSSION

## ISSUE 1

¶21    **Did the District Court err in awarding treble damages for forcible detainer?**

¶22    Section 70-27-103, MCA, provides:

> **Forcible detainer defined.** Every person is guilty of a forcible detainer who either:
> (1) by force or by menaces and threats of violence unlawfully holds and keeps the possession of any real property or mining claim, whether it was acquired peaceably or otherwise; or
> (2) in the nighttime or during the absence of the occupant of any lands or mining claim unlawfully enters upon real property and, after demand made for the surrender thereof, for the period of 5 days refuses to surrender the same to such former occupant. The occupant of real property or mining claim, within the meaning of this subsection, is one who, within 5 days preceding such unlawful entry, was in the peaceable and undisputed possession of such lands.

7

Section 70-27-206, MCA, provides:

> **Treble damages.** If a person recovers damages for a forcible or unlawful entry in or upon or detention of any building or cultivated real property, judgment may be entered for three times the amount at which the actual damages are assessed.

¶23    Citing *John Mohr & Sons, Inc. v. Jahnke* (Wis. 1972), 198 N.W.2d 363, 368, Savoy contends the imposition of treble damages is not remedial, but is intended to punish malefactors, and, likewise, is not intended as "over-compensation" for wronged parties, but as a deterrent. Savoy argues treble damages, being strictly penal in nature, must be strictly construed with doubts being resolved against the imposition of treble damages. Savoy maintains that this caveat has been consistently followed by courts on a broad range of issues, citing *State, Dept. of Livestock v. Sand Hills Beef* (1981), 196 Mont. 77, 83, 639 P.2d 480, 484; *Shipman v. Todd* (1957), 131 Mont. 365, 368, 310 P.2d 300, 302; *Shubat v. Glacier County* (1932), 93 Mont. 160, 163, 18 P.2d 614, 615 (tax penalties strictly construed); *El Paso Ref., Inc. v. Scurlock Permian Corp.* (Tex. App. 2002), 77 S.W.3d 374, 381 (usury penalties strictly construed).

¶24    Savoy asserts the District Court overlooked these principles and imposed treble damages despite gaps in the evidentiary record. Among other things, Savoy asserts there was no evidence that she ever resorted to violence or threats of violence against the Plaintiffs or that Savoy took "possession" of Hardings' land over their demand for its surrender.

**A. Force**

8

¶25 Citing language in *Grenfell v. Anderson*, 2002 MT 225, ¶ 55, 311 Mont. 385, ¶ 55, 56 P.3d 326, ¶ 55, defining "force" as "including not only actual application of physical force, but such threats or display of physical force as are reasonably calculated to inspire fear of death or bodily harm," Savoy argues that, even if she did wrongfully occupy Hardings' or Skogens' land, mere wrongful occupation of land is insufficient to establish the elements of forcible detainer under subsections (1) or (2) of § 70-27-103, MCA. *Grenfell*, ¶ 57. Savoy maintains the record is deficient regarding any evidence that she occupied Hardings' property.

¶26 Hardings and Skogens dispute Savoy's claim that the disputed land remained "unoccupied by mutual agreement" of the parties, noting both Hardings and Skogens reacted immediately to Savoy's actions by filing applications to the District Court for an injunction to prevent Savoy from further interference with their properties. At the hearing on the requested injunctions, Savoy resisted the demands that Hardings and Skogens be allowed to reclaim the disputed property. Hardings and Skogens respond that Savoy's resistance, in and of itself, is evidence of forcible detainer.

¶27 Hardings and Skogens also dispute Savoy's claim that she fenced off part of the disputed property in reliance upon the Latvala survey. The evidence showed Savoy destroyed the Skogen fence in September of 1999, nine months *before* Latvala completed his survey in July of 2000. Second, while Savoy claims she did not replace the destroyed Skogen fence with another fence, Orville Skogen testified he awoke on September 13, 2000, following the entry of a temporary restraining order, and observed a fence being built in the

9

disputed area which stretched along the Savoy/Murray property boundary. Warren Harding also testified to observing the removal of the remainder of the boundary fence in the Oxbow subsequent to the restraining order, although he testified on cross-examination he could not identify the specific individuals who were removing the fence.

¶28    The District Court had before it ample evidence of Savoy's intent to forcibly detain the disputed property. Testimony indicated Walt Savoy denied Skogen and deputy sheriffs access to the disputed property on the grounds it was private property that belonged to Savoy; Savoy dug a ditch across Skogens' road to deny them access by motor vehicle; Savoy twice called the deputy sheriff complaining of trespass after Orville Skogen had gone to inspect the disputed property; and Savoy cut Hardings' fence in April or May of 2000, rolling back the wire, and putting her own cows on the Oxbow.

¶29    Moreover, in the Spring of 2000, Guy Dubois entered onto the disputed land to conduct a survey for Skogens. While assisting with the work, Orville Skogen observed Walter Savoy leaning across a fence post holding a rifle and watching Dubois through the scope of the rifle while he conducted the survey.

¶30    In addition, after Savoy built the fence through the Oxbow, Warren Harding, Orville Skogen, and a neighbor, Allen Gagne, along with a deputy sheriff, went to inspect the area where the fence had been built, and were met by the Savoys who told them they were trespassing and that the land was now theirs. Warren Harding testified that, after the encounter, he would not go to the area again. Orville Skogen testified he told his family and employees not to go to the area because it was a "hostile environment," and because, when

10

anyone did go into the disputed area, a day or two later a deputy sheriff would arrive informing them they had been accused of trespassing.

¶31 In *Grenfell*, a landlord, believing his tenant breached their lease agreement, entered the leased premises when the tenant was not present and changed the locks. The tenant counterclaimed for forcible entry and forcible detainer. *Grenfell*, ¶ 12. This Court concluded that, as the district court had ample, credible evidence the landlord broke nothing and entered peaceably and did not thereafter turn the tenant out by force, threats, or menacing conduct, the landlord's actions did not constitute forcible entry. *Grenfell*, ¶ 56. Regarding the tenant's claim for forcible detainer, we agreed with the district court that the landlord's act of changing the locks effectively terminated the lease agreement, which, in turn, terminated the tenant's rights and obligations under the lease agreement, thus precluding a finding of forcible detainer. *Grenfell*, ¶¶ 60-61.

¶32 Given this Court's definition of "force" in *Grenfell*, as not only physical force, "but such threats or display of physical force as are reasonably calculated to inspire fear of death or bodily harm," we agree with Savoy that mere wrongful occupation of land or premises-- without more--is insufficient to satisfy the statutory requirements for forcible detainer. *Grenfell*, ¶ 55. However, this Court further stated in *Grenfell* that whether the circumstances surrounding a defendant's entry constitute violence is a question for the fact finder. *Grenfell*, ¶ 55. Likewise, whether the circumstances or actions by which one unlawfully holds and keeps the possession of any real property constitutes force or menaces and threats of violence, is also a question for the fact finder. This Court will not overturn a district

11

court's finding unless it is clearly erroneous. *Grenfell*, ¶ 55 (citing *Tungsten Holdings, Inc. v. Olson*, 2002 MT 158, ¶ 13, 310 Mont. 374, ¶ 13, 50 P.3d 1086, ¶ 13).

¶33     Given our review of the record and the District Court's findings as highlighted above, we cannot conclude that the District Court clearly erred in finding that Savoy used sufficient force to satisfy the forcible detainer statute.

### B. Possession

¶34     Savoy also contends she was never in "possession" of the disputed property in a manner sufficient to satisfy the statutory requirements for forcible detainer, as she claims she did not attempt to further detain the disputed property after Skogens filed the current action. Given the statutes defining forcible detainer do not define "possession," Savoy cites to Montana's adverse possession statutes, specifically § 70-19-408, MCA, which provides in part:

> (1) For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument or judgment or decree, land is deemed to have been possessed and occupied in the following cases:
> . . .
> (b) where it has been protected by a substantial enclosure.
> . . .

Savoy argues that, as she did not substantially enclose the property from Hardings, she could not have been considered "in possession."

¶35     When a statute fails to define a specific word, we do not look to unrelated statutes but construe the word according to its plain meaning. *See Sherner v. Conoco, Inc.*, 2000 MT 50, ¶ 36, 298 Mont. 401, ¶ 36, 995 P.2d 990, ¶ 36. "Possession" is defined as: "4. Actual

holding or occupancy with or without rightful ownership." *The American Heritage Dictionary of the English Language*, (4th ed. 2000). We conclude it is immaterial, when determining possession, whether Savoy did or did not build a fence that completely enclosed or substantially enclosed the land from Hardings. To determine "possession," the court must merely inquire whether the defendant actually held or occupied the land or premises in question.

¶36 Based upon the court's findings of fact, we conclude the District Court correctly determined Savoy's actions satisfied the statutory requirements for "possession" of the disputed land.

¶37 Based on the foregoing, we conclude the District Court did not err when it determined that a forcible detainer, as proscribed by § 70-27-103, MCA, occurred. This being so, the award of treble damages under § 70-27-206, MCA, was within the appropriate exercise of the District Court's discretion.

13

**ISSUE 2**

¶38    **Did the District Court err in its award of the money judgment?**

    **A.  Applicable Statute**

¶39    Savoy argues Hardings and Skogens are entitled only to the fair rental value of any land she wrongly occupied, based on the measure of damages provided in § 27-1-318, MCA, for the wrongful occupation of property.  She next asserts that since they did not present any evidence of fair rental value, they are not even entitled to this amount.

¶40    Hardings and Skogens claim Savoy wrongly relies on § 27-1-318, MCA.  They assert the correct measure of damages is listed in the wrongful detainer statute, § 70-27-205, MCA, which they claim they specifically pled and proved.

¶41    Savoy's argument relies entirely on the assumption that Hardings and Skogens did not meet the elements necessary to prove forcible detainer.  Since we have already held the District Court did not err in finding Savoy's conduct qualified as a forcible detainer, Savoy's argument must fail.  If a district court awards its judgment based on the forcible detainer statute, § 70-27-205, MCA, then the measure of damages provided for in the wrongful occupation of property statute, § 27-1-318, MCA, does not apply.  *See Westlake v. Osborne* (1988), 230 Mont. 364, 371, 750 P.2d 444, 448-49.  Rather § 70-27-205, MCA, is the correct statute by which to measure Hardings' and Skogens' damages.

## B. Damages Recoverable as a Result of a Forcible Detainer

¶42    Savoy argues if Hardings and Skogens are entitled to any damages at all, their award should be limited to the damages supported by evidence at trial, which Savoy claims to be $6,605.00 for Hardings and $1,584.00 for Skogens. She claims the District Court erred when it awarded $30,000.00 in economic loss to Skogens, as such amount is comprised chiefly of litigation expenses. Savoy argues further that Hardings and Skogens are not entitled to an award for loss of peaceful and quiet enjoyment because they did not cite any authority in support of such an award and because they failed to offer any proof regarding the value of this loss, choosing an arbitrary figure of $10,000.00 for the first time in their proposed order.

¶43    Hardings and Skogens respond they are entitled to all damages caused by Savoy's conduct, including lost profits, emotional distress, and incidental damages. They argue because Savoy is guilty of forcible detainer, all damages caused by Savoy are recoverable under the statute, including those for emotional distress caused by loss of peaceful and quiet enjoyment. Further, they assert Savoy never contested any of the damages claimed by the parties at trial and that this alone is a basis for affirming the District Court's judgment. Skogens further assert their damage award of $30,000.00 was not compensation for litigation expenses, but was for lost business profits directly attributable to Savoy.

¶44    Section 70-27-205, MCA, provides that a plaintiff who proves a wrongful detainer is entitled to restitution of the premises, recovery of rent, and all damages caused by the unlawful detainer. We have not previously addressed the question of whether emotional

15

distress damages, damages for lost profits, and incidental damages are recoverable under this statute. However, the California Court of Appeals has done so, relying on a virtually identical statute, and holding a plaintiff is entitled to recover any damages that are the natural and proximate consequence of the alleged forcible or unlawful detainer, including lost profits. *San Francisco & Suburban Home Building Society* (1911), 17 Cal. App. 254, 266, 119 P. 405, 410; *see* 36A C.J.S. Forcible Entry and Detainer § 60 (2003) (damages which are the natural and proximate consequence of a forcible detainer are recoverable).

¶45    As with any other finding, a "district court's damage determination is a factual finding which must be upheld if it is supported by substantial evidence . . . ." *Semenza v. Bowman* (1994), 268 Mont. 118, 125, 885 P.2d 451, 455. Since the district court is in the best position to determine the proper amount of damages, *Keily Constr. L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 106, 312 Mont. 52, ¶ 106, 57 P.3d 836, ¶ 106, its decision will not be disturbed "unless the amount awarded is so grossly out of proportion to the injury as to shock the conscience." *Maloney v. Home and Inv. Ctr., Inc.,* 2000 MT 34, ¶ 29, 298 Mont. 213, ¶ 29, 994 P.2d 1124, ¶ 29.

¶46    Savoy's argument that the damage award should be limited to $6,605.00 for Hardings and $1,584.00 for Skogens is not persuasive. Savoy did not contest any damage evidence put on by Hardings and Skogens at trial. Nor did she attempt to prove Hardings and Skogens failed to mitigate their damages. Thus, the only evidence upon which the District Court could base its decision was that presented by Hardings and Skogens. We conclude the District Court's award of $29,440.00 in damages, trebled to $88,320.00, to Hardings and its

16

award of $33,700.00, trebled to $101,100.00, to Skogens is supported by substantial evidence in the record and is therefore, not clearly erroneous.

¶47    Finally, Savoy's argument that Hardings and Skogens are not entitled to emotional distress damages based on loss of peaceful and quiet enjoyment must also fail.  We have previously allowed emotional distress damages in disputes regarding real property. *Maloney*, ¶¶ 67-69.  Further, the District Court awarded only half of what the parties requested, and there was ample uncontroverted evidence in the record to support such an award.  Thus, we hold the District Court did not err in its award of $10,000.00, trebled to $30,000.00, for loss of peaceful and quiet enjoyment to both Hardings and Skogens.

## ISSUE 3

¶48    **Did the District Court err in finding a prescriptive easement in favor of Skogens across Murray's Lot 13?**

### A.  Burden of Proof

¶49    Murray asserts Skogens failed to sustain their burden of proving by clear and convincing evidence their claim of a prescriptive easement across his Lot 13.  In support of this assertion, Murray states the District Court referenced the wrong standard of proof in its Conclusions of Law.  Specifically, he asserts the District Court used the "preponderance of the evidence" standard instead of the proper "clear and convincing" standard for establishing the existence of a prescriptive easement.

¶50    Skogens counter that the District Court did apply the correct standard when the findings and conclusions are read in their entirety.  Skogens point to numerous examples

17

where the District Court applied the clear and convincing standard. They argue that even if preponderance of the evidence standard was mistakenly included in the District Court's Conclusions of Law, the evidence in the record meets the proper standard. Last, while Skogens believe remand is unnecessary, they assert the proper remedy if this Court were to agree with Murray is to remand to the District Court with instructions to reconsider using the proper burden of proof.

¶51 Elements of a prescriptive easement claim must be proven by clear and convincing evidence. *Wareing v. Schreckendgust* (1996), 280 Mont. 196, 206, 930 P.2d 37, 43. Clear and convincing evidence is defined in *Wareing* as "a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof." *Wareing*, 280 Mont. at 206, 930 P.2d at 43.

¶52 Savoy's argument that the District Court used the wrong standard is not persuasive. Savoy relies solely on the District Court's general Conclusion of Law, which in referring to the facts of the entire case, states "the above referenced facts are established by a preponderance of the evidence." Savoy ignores Conclusion of Law No. 110, specifically stating Skogens proved through "a clear preponderance of the evidence" all of the elements necessary to establish a prescriptive easement. In Conclusion of Law No. 111, the District Court determined Skogens proved by "clear and convincing evidence" Murray acquiesced in their use. In light of the definition of "clear and convincing" from *Wareing*, it is evident

18

from the District Court's language it applied the correct standard of proof in determining a prescriptive easement existed.

## B. Prescriptive Easement Claim

¶53     To establish an easement by prescription, a claimant must establish open, notorious, continuous, uninterrupted, exclusive and adverse use of an easement for five years before the commencement of the action.  *Albert,* ¶ 20; Section 70-19-404, MCA.  Montana has consistently followed the minority rule, which holds that open, notorious, continuous, uninterrupted and exclusive use raises a presumption that the use was also adverse.  *Albert*, ¶ 20; *Renner v. Nemitz*, 2001 MT 202, ¶ 13, 306 Mont. 292, ¶ 13, 33 P.3d 255, ¶ 13; *Wareing*, 280 Mont. at 209, 930 P.2d at 45; *Warnack v. Coneen Family Trust* (1996), 278 Mont. 80, 83, 923 P.2d 1087, 1089; *Lemont Land Corp. v. Rogers* (1994), 269 Mont. 180, 185, 887 P.2d 724, 727-28; *Mountain View Cemetery v. Granger* (1978), 175 Mont. 351, 356, 574 P.2d 254, 257.  However, mere occasional recreational use is insufficient to raise this presumption.  *Albert*,  ¶ 20.

¶54     Murray asserts Skogens failed to prove all elements of their prescriptive easement claim.  Specifically, Murray claims the evidence did not show consecutive use for five years and did not show adverse use.  Murray makes no specific allegations as to how Skogens failed to satisfy the prescriptive elements of continuous use, exclusive use and uninterrupted use.

19

¶55   Skogens, in turn, argue each element of their claim for a prescriptive easement was supported by substantial evidence.  They point out Murray did not offer any contrary evidence upon which the Court could rely.

¶56   We do not find it necessary to recount here in detail the substantial evidence before the District Court which supported its finding that every element of Skogens' prescriptive easement claim was met.  We conclude, based upon our review of the record, that the District Court did not err in finding a prescriptive easement in favor of Skogens across Murray's Lot 13, nor did it err in its description of the easement.

## ISSUE 4

¶57   **Did the District Court err in its findings regarding the movement of the Sun River in the disputed areas?**

¶58   The District Court found the meander channel of the Sun River between Hardings' Lot 1 and Savoy's Lot 7, in the area known as the Oxbow, moved south by accretion from where it was depicted in the 1906 government survey, into what is depicted on the 1937 aerial photograph attached to the judgment as "the abandoned channel."  The District Court found the same channel of the Sun River then moved north by avulsion in 1916 to its present day location.  The court also determined the Sun River, in the area known as the Island, moved north by avulsion in 1948.

¶59   Savoy, on appeal, does not dispute the river moved north by avulsion; however, she does dispute the river accreted south sometime between 1906 and 1916.  Savoy claims the evidence of accretion is too tenuous and thus the District Court erred when it moved the

20

northern boundary of Lot 7 south to the midpoint of the abandoned channel. Savoy maintains the northern boundary of her Lot 7 should be the midpoint of the river as is existed in 1906, prior to its avulsion to the north in 1916.

¶60 "Avulsion" occurs when a river suddenly changes its channel to form a new one. If avulsion moves a river away from a landowner's property, the property boundary does not change. "Accretion" occurs when a river gradually and imperceptibly changes its course over a period of time, resulting in sedimentary deposits on one bank along the water line. In this case, the property boundary shifts with the water line. *Montana Dept. of State Lands v. Armstrong* (1992), 251 Mont. 235, 238, 824 P.2d 255, 257-58 (citation omitted).

¶61 There was ample evidence in the record to support the southward movement of the Sun River by accretion after the 1906 survey but before the 1916 avulsive event. Because the river accreted south after 1906, the year the lots in question were created, the property boundary moved along with the water line. However, when the river avulsed to its present day location in 1916, the property boundary did not move. Thus, we hold the District Court correctly determined the boundary between Hardings' and Savoy's lots.

¶62 As to Murray's claim, we conclude, based upon the evidence in the record, the District Court did not err when it found the Sun River, in 1948, avulsed north in the area of the Island to its present day location. The property boundaries remained where they were prior to the avulsion. Thus, we hold the District Court correctly determined the boundary line between Skogens' and Murray's lots.

¶63    Since we have affirmed the District Court's decisions regarding the property boundaries, we decline to discuss the merits of Hardings' and Skogens' alternative positions regarding adverse possession and laches.

## ISSUE 5

¶64    **Did the District Court err in denying Hardings' and Skogens' claims for attorney fees?**

¶65    Hardings and Skogens concede under the general American Rule, each side is responsible for paying its own attorney fees, and the equitable exception to this rule applies only to a party defending a wholly frivolous or malicious lawsuit. *Foy v. Anderson* (1978), 176 Mont. 507, 511-12, 580 P.2d 114, 116-17. However, they urge this Court to revise this exception to allow an award of attorney fees to a party forced to *bring* a lawsuit to determine their legal rights against a party who presents a frivolous defense asserted in bad faith. In support of this argument, they cite *Langemeier v. Kuehl*, 2001 MT 306, 307 Mont. 499, 40 P.3d 343. In *Langemeier*, this Court upheld an award of attorney fees by an arbitrator under the equitable exception. Hardings and Skogens claim Savoy and Murray forced them into frivolous litigation in which they had no chance of prevailing.

¶66    Savoy argues her property dispute with Hardings and Skogens was legitimate and not founded in bad faith. She asserts there is no sound basis to depart from the American Rule. In support of her position, she points to the District Court's denial of a punitive damage award to Hardings and Skogens, claiming this shows the District Court did not believe she was guilty of malice. Savoy distinguishes *Langemeier* on the bases it was an arbitration

case, a settlement agreement authorized the award of attorney fees, and all the parties involved requested attorney fees. Savoy argues *Foy* should not be expanded because this Court limited *Foy's* holding to its facts.

¶67 Murray argues since no money damages or attorney fees were requested of him in the complaint or in the final pretrial order, this Court cannot award them now. Murray's statement is incorrect. The final pretrial order signed by all counsel did include a claim for fees by Hardings and Skogens. Regardless, Murray raises this argument for the first time on appeal and as such, we decline to address its merits. *Nason v. Leistiko,* 1998 MT 217, ¶ 18, 290 Mont. 460, ¶ 18, 963 P.2d 1279, ¶ 18.

¶68 A district court's grant or denial of attorney fees is a discretionary ruling which we review for abuse of discretion. *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 15, 315 Mont. 210, ¶ 15, 69 P.3d 663, ¶ 15. The longstanding rule in Montana, also known as the American Rule, is absent a contractual or statutory provision to the contrary, attorney fees will not be awarded to the prevailing party in a lawsuit. *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 93, 322 Mont. 133, ¶ 93, 95 P.3d 671, ¶ 93 (citing *Erker v. Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, ¶ 43, 988 P.2d 1221, ¶ 43). In the present case, neither a statutory nor contractual basis for an award of attorney fees exists; however, in rare instances a district court may award attorney fees to an injured party under its equity powers. *Pankratz,* ¶ 93 (citing *Foy*, 176 Mont. at 511-12, 580 P.2d at 116-17).

¶69 We have recognized equitable exceptions to the American Rule. *See, e.g., Mt. W. Farm Bureau Mut. Ins. Co. v. Hall*, 2001 MT 314, ¶ 14, 308 Mont. 29, ¶ 14, 38 P.3d 825,

23

¶ 14 (awarding attorney fees when a party incurs legal fees to establish a common fund which avails non-participating beneficiaries); *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land Commr's*, 1999 MT 263, ¶ 67, 296 Mont. 402, ¶ 67, 989 P.2d 800, ¶ 67 (awarding attorney fees pursuant to the private attorney general theory). In addition, we have awarded attorney fees when a party has been forced to defend against a wholly frivolous or malicious action. *Foy*, 176 Mont. at 511, 580 P.2d at 117. However, such awards are determined on a case-by-case basis. *Pankratz*, ¶ 93 (citing *Foy*, 176 Mont. at 511, 580 P.2d at 117). We have specifically declined to adopt a malicious or bad faith equitable exception to the American Rule. *Goodover v. Lindey's* (1992), 255 Mont. 430, 448, 843 P.2d 765, 776; *Erker*, ¶ 44. Further, we have held where a party chooses to institute a suit against others, an award of attorney fees to the plaintiff will normally be precluded. *Goodover*, 255 Mont. at 447, 843 P.2d at 775; *Youderian Constr. v. Hall* (1997), 285 Mont. 1, 15, 945 P.2d 909, 917.

¶70 Hardings and Skogens cite *Langemeier* for the proposition that a prevailing plaintiff is entitled to an award of attorney fees under the equitable exception to the American Rule. In *Langemeier*, a lawsuit was filed by James Kuehl against several defendants, including the Langemeiers, seeking to quiet title to an abandoned easement and damages for trespass. As motions for summary judgment were pending, the district court ordered the parties into mediation. The parties then agreed upon a Memorandum of Understanding and Settlement Agreement, both of which provided any future disputes would be resolved by arbitration. Subsequently, the Langemeiers requested arbitration claiming James Kuehl had violated the

24

Settlement Agreement. The arbitrator awarded the Langemeiers attorney fees against James Kuehl and his father, Robert Kuehl. We determined the arbitrator had a reasonable basis under his equitable powers to award attorney fees. *Langemeier*, ¶ 17. However, unlike Hardings and Skogens in this case, the Langemeiers were defendants in the underlying lawsuit and did not initiate any legal action but only asserted their rights under the Settlement Agreement.

¶71    Given our longstanding rule precluding an award of attorney fees in a lawsuit absent a statutory or contractual basis for doing so, our inclination to decline under most circumstances to award attorney fees to a plaintiff, and *Langemeier's* inapplicability, we conclude the District Court did not abuse its discretion when it denied an award of attorney fees to Hardings and Skogens.

¶72    Affirmed.

/S/ PATRICIA O. COTTER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM REGNIER