DA 08-0352

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 448

ESTATE OF EARL M. PRUYN, acting through
the Personal Representative JACK MEYER,

Plaintiff and Appellant,

v.

AXMEN PROPANE, INC., a Montana corporation,
and EDWARD KIMBRELL, individually,

Defendants and Appellees.

| APPEAL FROM: | District Court of the Fourth Judicial District, |
| --- | --- |
| | In and For the County of Missoula, Cause No. DV 2004-589 |
| | Honorable Robert L. Deschamps, III, Presiding Judge |

COUNSEL OF RECORD:

For Appellant:

Randy J. Cox, Scott M. Stearns, Thomas J. Leonard, Boone Karlberg P.C.
Missoula, Montana

For Appellee Axmen Propane, Inc.:

David B. Cotner, Trent N. Baker, Erika Peterman, Datsopoulos,
MacDonald & Lind, P.C., Missoula, Montana

For Appellee Edward Kimbrell:

Edward Kimbrell, (Self-Represented), San Antonio, Texas

Submitted on Briefs: August 5, 2009

Decided: December 29, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Earl Pruyn filed suit against Edward Kimbrell and Axmen Propane, Inc. (Axmen) claiming they had defaulted under the terms of a promissory note. After Pruyn's death in June 2008, his estate was substituted as plaintiff in this case. Eventually, the District Court for the Fourth Judicial District, Missoula County, denied Pruyn's motions for summary judgment and granted Axmen's cross-motions for summary judgment and awarded Axmen its attorney's fees. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2 Pruyn raises the following issues on appeal:

¶3 1. Did the District Court err in overturning a prior order granting summary judgment to Pruyn?

¶4 2. Did the District Court err in granting summary judgment to Axmen on Pruyn's contract claim?

¶5 3. Did the District Court err in granting summary judgment to Axmen on Pruyn's unjust enrichment claim?

¶6 4. Did the District Court abuse its discretion in awarding Axmen its attorney's fees?

¶7 5. Were Pruyn's due process rights violated as a result of Axmen's *ex parte* communications with the District Court?

**Factual and Procedural Background**

¶8 Edward Kimbrell, Guy Hanson and Grant Hanson co-owned Axmen, a full-service propane retailer in Missoula, Montana. Because Kimbrell had expertise in the propane

2

business, he became managing partner when the partnership was formed in 1999, and then President when Axmen was incorporated in 2000. Kimbrell and the Hansons were Axmen's only shareholders, its only officers, and its only directors. The three provided the company's initial capitalization from their own pockets and they held equal shares in the company.

¶9 Kimbrell ran the day-to-day operations at Axmen while the Hansons worked at another location running their other business ventures. A large part of Kimbrell's duties involved purchasing propane. He often bought thousands of gallons of propane by simply picking up the phone and calling a supplier. Besides purchasing propane to maintain Axmen's normal stock levels, Kimbrell also purchased large quantities of propane to "hedge" against price fluctuations. In these transactions, Kimbrell would purchase large amounts of propane for delivery over several months rather than a few days to "lock in" a fixed price for Axmen and its customers.

¶10 Powderhorn Petroleum (Powderhorn) was one of Axmen's main propane suppliers, and Kimbrell entered into numerous propane procurement and futures transactions with Powderhorn. In March 2003, Kimbrell and two others, John Giuliani and Shawn Diehl, entered into a propane transaction with Powderhorn for the purchase of 1.7 million gallons of propane, almost 20 times the volume of any previous order by Axmen. Shortly after entering into this transaction with Powderhorn, propane prices dropped and Kimbrell incurred a substantial loss. To finance this loss, Kimbrell approached Pruyn for a loan. Pruyn was a local businessman who often lent money on

business ventures. Pruyn later testified that he understood from Kimbrell that Axmen needed to borrow money to acquire property in the Bitterroot for a larger supply of tanks.

¶11 Kimbrell had several meetings with Pruyn wherein he gave Pruyn information relating to Axmen's assets, cash flow and accounts receivable. Pruyn testified that based upon the documentation from Axmen as well as his own investigation into the company's reputation and overall business prospects, he decided to lend Axmen $544,500. Pruyn also testified that although he told his attorney to draft the promissory note "to Axmen Propane guaranteed by Guy and Grant Hansen [sic], personally," Axmen was not specifically mentioned in the note. The promissory note included signature blocks for Kimbrell and both of the Hansons, but it did not indicate that they would be signing in any representative capacity.

¶12 On April 4, 2003, Kimbrell executed the note forging the Hansons' signatures. After Kimbrell returned the signed note to Pruyn, the money was wired to Powderhorn's bank to pay off the debt to Powderhorn. Although the promissory note was not paid as agreed, Pruyn did receive two cashier's checks from Kimbrell, one dated August 11, 2003, for $20,000, and one dated October 1, 2003, for $40,000.

¶13 On Christmas Eve 2003, Pruyn discussed the promissory note with Guy Hanson. Pruyn learned at that time that neither of the Hansons knew anything about the loan, the

4

promissory note, or the Powderhorn debt. Kimbrell subsequently admitted that he had forged the Hansons' signatures on the note.[1]

¶14 Pruyn filed this action against Axmen and Kimbrell on July 8, 2004, seeking the unpaid principal balance on the promissory note, accrued interest, all costs and expenses of suit, and attorney's fees. Axmen filed its Answer, Cross Claim and Demand for Jury Trial on September 2, 2004, wherein Axmen contended that the note was barred by the statue of frauds because Axmen is not mentioned in the note. Axmen also filed a cross claim against Kimbrell for, among other things, fraud, constructive fraud, breach of fiduciary duty, and unjust enrichment.

¶15 On July 25, 2005, Pruyn moved for summary judgment asserting that the undisputed material facts showed that because Kimbrell had authority to speak on behalf of Axmen and to enter into the subject loan transaction, Axmen was liable on the promissory note. After reviewing the parties' briefing and hearing oral argument, then District Court Judge Henson[2] granted summary judgment in favor of Pruyn. In his March 20, 2006 Opinion and Order, Judge Henson determined that Kimbrell had ostensible authority to bind Axmen in the loan transaction, and that Axmen had retained the benefit of the loan by applying it toward its debt with Powderhorn. Judge Henson

---

[1] Criminal charges were brought against Kimbrell and he was eventually found guilty of forgery in violation of § 45-6-325, MCA, and sentenced to twenty years at Montana State Prison with all twenty years suspended.

[2] Judge Henson resigned on March 31, 2006; however, his successor, Judge Deschamps, was not appointed and sworn in until July 10, 2006.

5

also determined that Pruyn should not be made to suffer for Kimbrell's actions even if the loan transaction was accomplished fraudulently and without actual authority.

¶16 On April 28, 2006, Axmen filed a Motion for Relief from Opinion and Order. When the District Court failed to make a decision on the motion within 60 days of its filing, Pruyn filed a "Notice of 60 Day Pendency of Axmen Propane's Motion for Relief from Opinion and Order" on June 28, 2006, arguing that the motion had been deemed denied. The following day, Axmen filed its Renewed Motion for Relief from Opinion and Order. Since Judge Henson had retired and his successor had not yet been appointed or sworn in, the matter was called to the attention of Judge McLean, who, on July 6, 2006, granted Axmen's request and vacated Judge Henson's order. Pruyn moved to set aside Judge McLean's order claiming the 60-day time period for considering Axmen's motion had expired prior to Judge McLean's ruling. Thereafter, the case was assigned to newly-appointed Judge Deschamps for further proceedings.

¶17 On January 24, 2007, Judge Deschamps, confronted with what he considered to be mistakes by both of his predecessors, declined to set aside Judge McLean's order. In his Opinion and Order, Judge Deschamps stated that the "simple solution" would be to set aside Judge McLean's order as untimely thereby reinstating Judge Henson's original order, and allow Axmen to appeal. However, Judge Deschamps, "convinced that Axmen would prevail on appeal," decided to forego the appeal process altogether and opted for "the more just, albeit risky, approach of upholding Judge McLean's order." In doing so, Judge Deschamps stated that "for reasons of equity and avoiding enforcing an order that was issued in error, Judge McLean's order must stand and the parties must have their day

6

in court." Judge Deschamps further stated that "Judge McLean's weeklong delay in ruling on Axmen's motion due to administrative upheaval in the District Court is unfortunate, but excusable."

¶18    Both Axmen and Pruyn again moved for summary judgment. On July 23, 2007, Judge Deschamps granted partial summary judgment to Axmen finding that the promissory note was not a corporate obligation of Axmen. In dismissing Pruyn's contract claim, Judge Deschamps determined that Pruyn might still be entitled to restitution from Axmen under one of the unjust enrichment claims pled in this matter.

¶19    Axmen urged a stay of the civil proceedings while the criminal matter against Kimbrell was pending. Pruyn, who was 83 years old at the time, objected to further delaying the lawsuit, but Judge Deschamps ruled in Axmen's favor and stayed the proceedings. Kimbrell was found guilty of forgery on January 3, 2008. After Kimbrell was sentenced, the court lifted the stay in the instant case, and the parties briefed the unjust enrichment issue.

¶20    Pruyn passed away on June 11, 2008, and his estate was substituted as plaintiff in this case.[3] In an Opinion and Order dated June 27, 2008, Judge Deschamps determined that Axmen was not unjustly enriched at the expense of Pruyn, thus Axmen was entitled to judgment as a matter of law on Pruyn's unjust enrichment claim.

¶21    Pruyn filed a Notice of Appeal on July 25, 2008. On August 7, 2008, Axmen moved the District Court for an award of attorney's fees, and also moved this Court to

---

[3]  Even though Pruyn's estate was substituted as plaintiff in this matter, for purposes of clarity, we will continue to refer to the plaintiff and appellant simply as "Pruyn."

dismiss Pruyn's appeal as premature. We denied Axmen's motion to dismiss Pruyn's appeal, but remanded the case to the District Court for a ruling on Axmen's motion for attorney's fees. *Est. of Pruyn ex rel. Meyer v. Axmen Prop.*, 2008 MT 329, ¶¶ 15-16, 346 Mont. 162, 194 P.3d 650.

¶22 On remand, the District Court awarded Axmen its attorney's fees stating that "Pruyn's actions in this matter were in the very least frivolous and perhaps even malicious." Pruyn now appeals the various orders of the District Court on summary judgment as well as the court's award of attorney's fees to Axmen.

**Standard of Review**

¶23 Summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Eastgate Village Water and Sewer v. Davis*, 2008 MT 141, ¶ 18, 343 Mont. 108, 183 P.3d 873 (citing *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, 92 P.3d 620). Our standard in reviewing a district court's summary judgment ruling is de novo; we use the same M. R. Civ. P. 56 criteria applied by the district court. *Eastgate*, ¶ 18. Moreover, all reasonable inferences which may be drawn from the offered proof must be drawn in favor of the party opposing summary judgment. *Eastgate*, ¶ 18. If there is any doubt regarding the propriety of the summary judgment motion, it should be denied. *Eastgate*, ¶ 18 (citing *360 Ranch Corp. v. R & D Holding*, 278 Mont. 487, 491, 926 P.2d 260, 262 (1996); *Whitehawk v. Clark*, 238 Mont. 14, 18, 776 P.2d 484, 486-87 (1989)).

¶24 In addition, we review a district court's conclusions of law to determine whether they are correct. *Montana Pet. Tank Comp. Bd. v. Crumleys*, 2008 MT 2, ¶ 32, 341

8

Mont. 33, 174 P.3d 948 (citing *State Farm Mut. Auto. Ins. Co. v. Gibson,* 2007 MT 153, ¶ 9, 337 Mont. 509, 163 P.3d 387).

¶25 We review a district court's order awarding attorney's fees for an abuse of discretion. *Harding v. Savoy*, 2004 MT 280, ¶ 68, 323 Mont. 261, 100 P.3d 976 (citing *Trustees of Indiana University v. Buxbaum,* 2003 MT 97, ¶ 15, 315 Mont. 210, 69 P.3d 663). A district court abuses its discretion if it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶ 19, 338 Mont. 423, 166 P.3d 451 (citing *Jarvenpaa v. Glacier Elec. Co-op., Inc.,* 1998 MT 306, ¶ 13, 292 Mont. 118, 970 P.2d 84; *C. Haydon Ltd. v. MT Min. Properties, Inc.,* 286 Mont. 138, 146, 951 P.2d 46, 51 (1997)).

**Issue 1.**

¶26 *Did the District Court err in overturning a prior order granting summary judgment to Pruyn?*

¶27 Pruyn contends that Axmen's Motion for Relief from Opinion and Order was a poorly disguised motion for reconsideration that is not authorized by the Montana Rules of Civil Procedure. Pruyn also contends that even if Axmen's motion were considered a motion to alter or amend judgment under M. R. Civ. P. 59(g), it was error for Judge McLean to rule on that motion after the expiration of the 60-day time period set forth in M. R. Civ. P. 59(g), and error for Judge Deschamps to affirm Judge McLean's mistake. Pruyn further contends that Judge Henson's Opinion and Order was the law of the case and that it could only be altered under certain limited circumstances, or after appeal to

9

this Court. To that end, Pruyn argues that in vacating Judge Henson's order, Judge McLean improperly exercised appellate jurisdiction.

¶28 Axmen argues on the other hand that because no notice of entry of judgment or order pursuant to M. R. Civ. P. 77(d) was ever filed or served in this case, Judge Henson's summary judgment order did not constitute a final judgment, thus it could be changed at any time by Judge Henson or a successor judge in that court. Axmen further argues that contrary to Pruyn's contentions, Judge McLean's decision to vacate Judge Henson's order was not untimely. Axmen also argues that Pruyn's "law of the case" doctrine is misplaced.

¶29 First, concerning the procedural problems surrounding Axmen's motion and the various rulings of the successor district court judges, we note that "[a] judgment is the *final* determination of the rights of the parties in an action or proceeding . . . ." M. R. Civ. P. 54(a) (emphasis added). When there are multiple claims for relief or multiple parties, a judgment is not final unless it is certified as such by the court, and if it is not so certified, it "is *subject to revision* at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." M. R. Civ. P. 54(b) (emphasis added).

¶30 Although Axmen claimed in its Motion for Relief from Opinion and Order that it was filing the motion pursuant to M. R. Civ. P. 60, that rule applies to *final* judgments, orders, or proceedings. M. R. Civ. P. 60(b). As Judge Deschamps pointed out in his January 25, 2007 Opinion and Order, Judge Henson's order was "interlocutory in nature

10

and is subject to a motion under Rule 54(b) where the only time limit is that it be ruled upon prior to final judgment being entered."

¶31   In *Smith v. Foss*, 177 Mont. 443, 447, 582 P.2d 329, 332 (1978)*,* this Court held that

> [s]o long as a court has jurisdiction over an action, it should have plenary power over its interlocutory orders and should be able to revise them when it is consonant with justice so to do. Court control over an interlocutory order should not be subject to the restrictions of Rule 60(b).

¶32   We made a similar ruling in *Teamsters Union v. C.N.H. Acquisitions*, 2009 MT 92, 350 Mont. 18, 204 P.3d 733, regarding M. R. Civ. P. 59 motions to alter or amend. In *Teamsters*, the defendant argued that a renewed motion for summary judgment was improperly granted because it constituted an M. R. Civ. P. 59 motion to alter or amend a judgment. We held in that case that M. R. Civ. P. 59 was not applicable because that rule concerns judgments and when the plaintiffs filed their renewed motion, there was no judgment. *Teamsters*, ¶ 18.

¶33   Here, final judgment as applied to all parties was never entered following Judge Henson's Opinion and Order—no monetary judgment and no notice of entry of judgment against Axmen or Kimbrell was ever filed. In addition, Kimbrell did not appear in this case until long after Judge Henson had issued his decision and, although there were multiple defendants, Judge Henson directed entry of judgment only against Axmen.

¶34   Because Judge Henson's Opinion and Order did not adjudicate all of the claims, rights and liabilities of all of the parties, there was no final disposition of the case prior to Judge McLean's and Judge Deschamps' rulings. Consequently, Judge Henson's Opinion

and Order was "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." M. R. Civ. P. 54(b). Hence, the 60-day time restrictions for ruling on motions filed under Rules 59(g) and 60(b) did not apply. Thus, we hold that Judge McLean's ruling vacating Judge Henson's Opinion and Order was timely. Under that same rationale, we hold that Pruyn's law-of-the-case argument is misplaced.

¶35 As to the merits of Axmen's claim in its Motion for Relief from Opinion and Order, we hold that Judge McLean and Judge Deschamps were correct in vacating Judge Henson's order. Axmen presented newly discovered or previously unavailable evidence regarding a statement to police made by Pruyn's attorney, Dennis Starkel, in connection with Kimbrell's criminal trial. Even though this statement was taken more than a year prior, the statement was not available to the parties at the time of Judge Henson's decision because it was part of the confidential criminal justice information in the criminal proceedings against Kimbrell. The County Attorney had not disclosed this information as of the date of the initial summary judgment proceedings in this case. In addition, Axmen was unable to obtain this information through discovery in the civil matter because Pruyn asserted attorney-client privilege.

¶36 This previously unavailable statement of Starkel's concerning the facts surrounding the creation of the promissory note created an issue of material fact regarding whether the note obligated Axmen precluding summary judgment. Given this, we conclude that Judge McLean's decision to vacate Judge Henson's order was appropriate and, indeed, mandated.

¶37    "[T]he purpose of summary judgment is to eliminate unnecessary trials, but . . . summary adjudication 'should never be substituted for a trial if a material factual controversy exists.' " *Bradley v. Crow Tribe of Indians*, 2005 MT 309, ¶ 15, 329 Mont. 448, 124 P.3d 1143 (quoting *Boyes v. Eddie*, 1998 MT 311, ¶ 16, 292 Mont. 152, 970 P.2d 91).

¶38    Accordingly, we hold that the District Court did not err in overturning Judge Henson's prior order granting summary judgment to Pruyn.

**Issue 2.**

¶39    *Did the District Court err in granting summary judgment to Axmen on Pruyn's contract claim?*

¶40    Concluding that the promissory note was not a corporate obligation for Axmen, the District Court granted summary judgment to Axmen on this claim. Pruyn now argues on appeal that in making this determination, the District Court disregarded undisputed facts demonstrating Kimbrell's ostensible authority to bind Axmen to the agreement. Pruyn also argues that the District Court misapplied the parole evidence rule as well as provisions of the Uniform Commercial Code (UCC).

¶41    In Montana, one entrusted with the management of a business can have either actual, implied or ostensible authority to make contracts on behalf of a business. *Audit Serv., Inc. v. Elmo Road Corp.*, 175 Mont. 533, 536-37, 575 P.2d 77, 79 (1978). "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." Section 28-10-403, MCA. Ostensible authority may be established "by omissions as well as by

13

commissions." *Northwest Polymeric v. Farmers State Bk.*, 236 Mont. 175, 178, 768 P.2d 873, 875 (1989). But, ostensible authority cannot be proven by the declarations of an agent whose statements are sought to be charged to the principal. *See Northwest Polymeric*, 236 Mont. at 177-78, 768 P.2d at 875; *Phelps v. Union Central Life Ins. Co.*, 105 Mont. 195, 199, 71 P.2d 887, 889 (1937).

> [I]t is elementary that the acts, declarations, admissions, statements, or representations of an agent are not admissible against the principal to prove the power or authority of the agent or the scope or extent thereof, unless such acts or declarations were done or made in the presence of the principal, or were within his knowledge, or were authorized or ratified by him, or there is other evidence of authority. The rule refers to declarations made by the agent out of court, off the witness stand, or otherwise than in his sworn testimony, and it means that such declarations cannot be testified to by a third person for the purpose of proving the scope or extent of the authority of the agent.

*Phelps*, 105 Mont. at 199, 71 P.2d at 889; *see also Exchange State Bank v. Occident Elevator Co.*, 95 Mont. 78, 89, 24 P.2d 126, 130 (1933).

¶42 "Part of the test to determine whether an ostensible authority exists is to determine what a prudent person, acting in good faith, under the circumstances, would reasonably believe the authority to be." *Youderian Const., Inc. v. Hall*, 285 Mont. 1, 10, 945 P.2d 909, 914 (1997). Furthermore,

> [a] person dealing with a known agent is not authorized under any circumstances blindly to trust the agent's statements as to the extent of his powers; such person must not act negligently, but must use reasonable diligence and prudence to ascertain whether the agent acts within the scope of his powers. In other words, a person dealing with an agent assumes the risk of lack of authority in the agent. He cannot charge the principal by relying upon the agent's assumption of authority which proves to be unfounded. The principal, on the other hand, may act on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency.

*Phelps*, 105 Mont. at 200, 71 P.2d at 889.

¶43 In this case, Kimbrell had never entered into any transactions similar to the promissory note with any party on Axmen's behalf, and neither the promissory note itself nor any other evidence supports Pruyn's assertions that Kimbrell was authorized to bind Axmen to the promissory note or to enter the transaction with Pruyn as Axmen's representative. The promissory note clearly contemplates only individual liability with no reference to Axmen or any indication that the individuals were signing in a representative capacity. The promissory note specifically provides that Kimbrell and the Hansons are the "Makers." The note also provides that "each Maker is jointly and severally bound hereon as a principal and not as a surety."

¶44 We agree with the District Court's conclusion that a reasonable lender in Pruyn's shoes, had he intended to bind Axmen to the Note, would have made sure Kimbrell had the authority to do so.

¶45 In addition, Pruyn's attorney, Dennis Starkel, testified in his deposition that he drafted the promissory note at Pruyn's request with Kimbrell and the Hansons as obligors. Starkel further testified that, in preparing the note, it was not his intention that the specific entity, Axmen, be an obligor on the note. Instead, Starkel testified that it was his goal in drafting the note to create individual liability to the three individuals who were to sign the note, Kimbrell, Guy and Grant Hanson, and not to create liability on behalf of Axmen or any other entity. Because of attorney-client privilege, Starkel did not testify

15

whether he followed Pruyn's instructions in drafting the note, but he did testify that in preparing the note he did not breach any professional duty owed to Pruyn.

¶46 Pruyn testified that he instructed Starkel to put the names of Kimbrell, Guy and Grant Hanson on the promissory note and that Starkel drafted the note as he, Pruyn, had instructed. Pruyn also testified as follows:

A. [Pruyn] . . . I wasn't loaning to the propane company only.
Q. [Pruyn's Counsel] You weren't.
A. No.
Q. Who were you loaning to?
A. To those two gentlemen that were on the note. My requirement was that they had to sign the note.
Q. And you're speaking of Grant Hanson and Guy Hanson.
A. Correct.

¶47 This Court has previously stated that "[e]xtrinsic evidence of contemporaneous or prior oral agreements which contradicts the express terms of a written agreement is admissible where the written agreement is ambiguous." *Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996) (citing *Haggerty v. Gallatin County*, 221 Mont. 109, 117-18, 717 P.2d 550, 555 (1986)). "Where the language of an agreement is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written." *Carelli*, 279 Mont. at 209, 926 P.2d at 761 (citing *Audit Services, Inc. v. Systad*, 252 Mont. 62, 65, 826 P.2d 549, 551 (1992)). An ambiguity exists when a contract is subject to two different interpretations, and under such circumstances, parol evidence can be used to determine the parties' intent. *Carelli*, 279 Mont. at 209, 926 P.2d at 761.

¶48 Section 28-2-905, MCA, Montana's parole evidence rule, provides:

**When extrinsic evidence concerning a written agreement may be considered.** (1) Whenever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms. Therefore, there can be between the parties and their representatives or successors in interest no evidence of the terms of the agreement other than the contents of the writing except in the following cases:

(a) when a mistake or imperfection of the writing is put in issue by the pleadings;

(b) when the validity of the agreement is the fact in dispute.

(2) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as described in 1-4-102, or other evidence to explain an extrinsic ambiguity or to establish illegality or fraud.

¶49 We find no ambiguity in the promissory note at issue here. It is clear on the face of the note that Kimbrell and the Hansons were to sign as individuals and not in any representative capacity. Thus, we agree with the District Court's conclusion that Pruyn intended that the Note was to be a personal responsibility of Kimbrell and the Hansons and specifically not an obligation of Axmen.

¶50 Among his other arguments, Pruyn contended on appeal that the District Court misapplied various provisions of the UCC to the facts of this case. As the parties suggest, the promissory note in this case is an "instrument" as defined by the UCC, Title 30, chapter 3, MCA, referring to negotiable instruments. Section 30-3-104, MCA. Under the UCC, a person or entity "is not liable on an instrument unless: (a) the person signed the instrument; or (b) the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under 30-3-403." Section 30-3-401, MCA. The UCC further provides:

(2) If a representative signs the name of the representative to an instrument and that signature is an authorized signature of the represented person, the following rules apply:

17

(a) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.

(b) . . . *if the form of the signature does not show unambiguously that the signature is made in a representative capacity, or the represented person is not identified in the instrument*, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. *With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties to the instrument did not intend the representative to be liable on the instrument.*

Section 30-3-403, MCA (emphasis added).[4]

¶51 In the instant case, Kimbrell's signature of his own name and his forgery of the Hansons' signatures only binds Kimbrell individually. The promissory note does not show unambiguously that Kimbrell was signing as a representative of Axmen. In addition, Axmen, as the represented person, is not identified in the promissory note. While Pruyn was the holder of the note and not a "holder in due course," the last sentence of § 30-3-403(2)(b), refers to "any other person." Thus, "[w]ith respect to any other person," such as Pruyn, Kimbrell alone is liable on the promissory note unless he can prove that Pruyn did not intend Kimbrell to be liable on the note. Section 30-3-403(2)(b), MCA. No such showing has been made here. On the contrary, as indicated in ¶¶ 45 and 46 of this Opinion, the evidence shows that Pruyn wanted the individuals—Kimbrell, Guy Hanson and Grant Hanson—liable on the note, not Axmen. The evidence further

---

[4] The Dissent maintains in ¶ 100 that only subsection (1) of § 30-3-403, MCA, applies to the facts of this case. On the contrary, subsection (2) qualifies subsection (1), thus subsection (2) properly applies to the facts in this case. If the Dissent's reasoning were correct, then any time Kimbrell signed a contract, even for his personal home mortgage, Axmen would be bound simply because Kimbrell signed the contract.

shows that Kimbrell made two payments to Pruyn on the note from Kimbrell's personal accounts and not from any account of Axmen's.

¶52    The evidence indicates that although Kimbrell was given authority by Axmen to purchase propane for Axmen's customers, Kimbrell was not given authority to speculate in such large amounts.  The 1.7 million gallons of propane purchased from Powderhorn in this speculative transaction was a quantity that Axmen could not take possession of nor sell in its business operations.  Such a large, short term, speculative transaction had never been entered into between Axmen and any supplier before this.   While Axmen occasionally purchased propane for future use to minimize risk due to price fluctuations, the amounts purchased were closer to 80,000 gallons based on Axmen's available storage capacity.   We cannot conclude from these facts that Kimbrell's signature alone would bind Axmen to a contract.

¶53    The Dissent contends that Kimbrell had ostensible authority to act as Axmen's agent.  Assuming, for the sake of argument, that is true, Pruyn nonetheless made a conscious decision to make the loan personally to Kimbrell and the Hansons; to have Kimbrell personally sign the note; and to not name Axmen as the payor.  *If* Pruyn believed that Kimbrell—exercising his ostensible authority—was acting on behalf of Axmen and, accordingly made Axmen the payor, and *if* Kimbrell had signed the note on behalf of Axmen, then we would have a different case.  Those are not the facts, however.  Pruyn was uniquely in the position to determine in whom he was creating a debt.  Pruyn chose to create a debt personally in Kimbrell and the Hansons, and not in the entity he now, belatedly, contends owes him repayment on the loan.  Once Kimbrell obtained the

19

loan funds, they were his to do with as he pleased. The debt on which Pruyn is suing was never Axmen's because Pruyn never *made* it Axmen's obligation. Pruyn is the author of his own misfortune.

¶54 As pointed out in ¶¶ 88 and 89 of the Dissent, there are two parts to the test for determining ostensible authority. However, because the test is worded in the conjunctive rather than the disjunctive, *both* parts of the test must be met for ostensible authority to exist. Even if we were to assume that the first part of the test had been met here, Pruyn has failed to establish that the facts in this case meet the second part of the test, i.e., that "a prudent person, acting in good faith, under the circumstances, would reasonably believe the authority to be." *Youderian*, 285 Mont. at 10, 945 P.2d at 914. Pruyn's own actions demonstrate that Pruyn himself was not convinced that Kimbrell had ostensible authority to bind Axmen to the note. If Pruyn believed so, he would not have instructed his attorney to require the Hansons' signatures on the note. Under the theory of ostensible authority suggested by Pruyn, Kimbrell's signature alone would have been enough to bind Axmen.

¶55 Because Pruyn instructed his attorney to draft the promissory note with the signatures of Kimbrell and the Hansons individually, any uncertainty in the note must be construed against Pruyn. "In cases of uncertainty . . . the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Section 28-3-206, MCA.

¶56 The Dissent states in ¶ 98 that if Kimbrell and Pruyn had intended to draft a loan agreement based solely on individual liability, Kimbrell would not have provided or

20

needed to provide Pruyn with information about the company's assets, cash flow and accounts receivable. Kimbrell would have simply shown Pruyn his own personal financial documents. First, the Dissent wrongly focuses on Kimbrell's actions to support its ostensible authority theory. Second, as already indicated, this raises the following questions: If Pruyn believed that Kimbrell had ostensible authority to bind Axmen to the agreement, why did Pruyn insist on having the Hansons' names on the note as well? And, assuming ostensible authority existed here, wouldn't Kimbrell's signature have been sufficient to bind Axmen?

¶57 The Dissent claims in ¶ 93 that "[i]t was only when the company suffered a financial loss that the Hanson brothers suddenly claimed that Kimbrell acted outside the scope of his authority." That supposition is not supported in the facts. Pruyn himself testified that when he approached Guy Hanson on Christmas Eve 2003 contending that Axmen owed Pruyn money, Guy Hanson disclaimed any knowledge of the promissory note or that Kimbrell had authority to enter into the note on behalf of Axmen. And, it was only after this encounter that Axmen learned that the promissory note was used to cover Kimbrell's speculative transaction.

¶58 Moreover, in analyzing the second prong of the ostensible authority test, rather than focusing on "what the principal did" as the Dissent says we must, the Dissent claims in ¶ 97 that Axmen is at fault because *Kimbrell* "met with Pruyn several times to discuss the loan" and that *Kimbrell* "gave Pruyn information relating to Axmen's assets, Axmen's cash flow and Axmen's accounts receivable." The Dissent also states in ¶ 97

21

that "[a] prudent person in Pruyn's position would believe that Kimbrell had authority to act on behalf of Axmen. . . ."

¶59    As already noted in this Opinion, "it is elementary that the acts, declarations, admissions, statements, or representations of an agent are not admissible against the principal to prove the power or authority of the agent or extent thereof . . . ." *Phelps*, 105 Mont. at 199, 71 P.2d at 889. In other words, *Kimbrell's* actions in producing certain information regarding Axmen are not relevant to a determination of ostensible authority.

¶60    Accordingly, we hold that the District Court did not err in granting summary judgment to Axmen on Pruyn's contract claim.

**Issue 3.**

¶61    *Did the District Court err in granting summary judgment to Axmen on Pruyn's unjust enrichment claim?*

¶62    Pruyn argues that regardless of any finding relative to Kimbrell's authority, the fact remains that Pruyn's money was used to pay off Axmen's account at Powderhorn, thus Pruyn contends he is entitled to *quantum meruit* as a matter of law. Axmen argues, on the other hand, that Pruyn's unjust enrichment claim fails because the obligation is governed by an express contract; Pruyn waived any unjust enrichment claim against Axmen when he accepted payments from Kimbrell; Pruyn cannot establish the required elements of unjust enrichment; and such a claim is inconsistent with the UCC.

¶63    Unjust enrichment is an obligation created by law in the absence of an agreement between the parties. *Maxted v. Barrett*, 198 Mont 81, 87, 643 P.2d 1161, 1164 (1982). In other words, courts have applied the theory of unjust enrichment when no contract

22

exists between the parties, but a contract in law is implied. *Maxted*, 198 Mont. at 87, 643 P.2d at 1164.

¶64    The doctrine of unjust enrichment is an equitable means of preventing one party from benefiting from his or her wrongful acts. *Albinger v. Harris*, 2002 MT 118, ¶ 21, 310 Mont. 27, 48 P.3d 711 (citing *Sebena v. State*, 267 Mont. 359, 367, 883 P.2d 1263, 1268 (1994); *Randolph V. Peterson, Inc. v. J.R. Simplot Co.*, 239 Mont. 1, 8, 778 P.2d 879, 883 (1989)).   Among other things, a claim of unjust enrichment requires a plaintiff to show the element of misconduct or fault on the part of the defendant or that the defendant somehow took advantage of the plaintiff. *Ragland v. Sheehan*, 256 Mont. 322, 327, 846 P.2d 1000, 1004 (1993).

¶65    The undisputed facts show that Pruyn fails to meet this latter requirement to show misconduct or fault on Axmen's part.  Axmen had no knowledge of the speculative transaction between Kimbrell and Powderhorn or the transaction between Kimbrell and Pruyn until Guy Hanson was confronted by Pruyn in December 2003.  Since Guy and Grant Hanson were not aware of either transaction until shortly before suit was filed, Pruyn could not show any misconduct or fault on Axmen's part.

¶66    The Dissent maintains that Axmen was unjustly enriched because  Kimbrell engaged in misconduct by using Pruyn's loan to pay off Axmen's debt to Powderhorn. First, the Dissent fails to recognize the significance of the fact that it was Kimbrell who engaged in misconduct, not Axmen.  Second, it has never been established that this was Axmen's debt.  We pointed out in ¶¶ 10 and 52 of this Opinion that although Kimbrell was given authority by Axmen to purchase propane for Axmen's customers, Kimbrell

23

was not given authority to speculate in this fashion. The 1.7 million gallons of propane purchased from Powderhorn in this transaction was a quantity that Axmen could not take possession of nor sell in its business operations. This amount was almost 20 times the volume of any previous order. Such a large, short term, speculative transaction had never been entered into between Axmen and any supplier before this. While Axmen occasionally purchased propane for future use to minimize risk due to price fluctuations, the amounts purchased were closer to 80,000 gallons based on Axmen's available storage capacity.

¶67 The Dissent also claims in ¶ 93 that "[t]here is no indication that if the prices had risen instead of dropped, that Axmen would have rejected the propane and large profits resulting from Kimbrell's dealings . . . ." However, there is also no indication that if there had been profits from this speculative deal of Kimbrell's that Axmen would have received any of said profits or that Axmen would even have known of the transaction to be able to reject or accept any such profits.

¶68 And, finally, the Dissent claims in ¶ 102 that "[t]he record shows that the money was wired to the Axmen Propane account at Powder Horn." The record shows no such thing. The "Wire/Funds Transfer Payment Order" shows the originator of the wire transfer as "Pruyn Ranch" and the beneficiary of the wire transfer as "Powder Horn Petroleum" referencing "Ed Kimbrell," not Axmen. Axmen is not mentioned anywhere in the wire transfer document. While the document the Dissent refers to in ¶ 102 was attached as an exhibit to Pruyn's deposition, that document makes no sense. As the

24

Dissent points out, that document is signed by Kimbrell, which begs the question: How could Kimbrell authorize a wire transfer from Pruyn's account?

¶69    Accordingly, we hold that the District Court did not err in granting summary judgment to Axmen on Pruyn's unjust enrichment claim

**Issue 4.**

¶70    *Did the District Court abuse its discretion in awarding Axmen its attorney's fees?*

¶71    In awarding Axmen its attorney's fees, the District Court determined that Axmen was drawn into this lawsuit by Pruyn and forced to defend itself, and that "Pruyn doggedly persisted in seeking compensation from Axmen" even though Pruyn knew "fairly early on" that Kimbrell forged Guy and Grant Hansons' signatures. The court concluded that "Pruyn's actions in this matter were in the very least frivolous and perhaps even malicious," thus the court granted Axmen's motion for attorney's fees "[i]n order to make Axmen whole."

¶72    "The longstanding rule in Montana, also known as the American Rule, is that, absent a contractual or statutory provision to the contrary, attorney fees will not be awarded to the prevailing party in a lawsuit." *Pankratz Farms, Inc. v. Pankratz*, 2004 MT 180, ¶ 93, 322 Mont. 133, 95 P.3d 671 (citing *Erker v. Kester*, 1999 MT 231, ¶ 43, 296 Mont. 123, 988 P.2d 1221). In rare instances, a district court may award attorney's fees to an injured party under that court's equity powers. *Pankratz*, ¶ 93 (citing *Foy v. Anderson*, 176 Mont. 507, 511-12, 580 P.2d 114, 116-17 (1978)). However, such awards are to be determined on a case-by-case basis, and "only when a party has been forced to defend against a wholly frivolous or malicious action." *Pankratz*, ¶ 93; *see also El*

*Dorado Heights Homeown. Ass'n v. Dewitt*, 2008 MT 199, ¶ 27, 344 Mont. 77, 186 P.3d 1249.

¶73    Pruyn argues on appeal that his actions to recover his money were not frivolous and malicious, and that the equitable exception to the American rule does not apply to the facts in this case. The promissory note specifically stated:

> If legal action is commenced to collect this Note, each Maker agrees that the venue of such action shall be in Missoula County, Montana, that such action may be maintained without regard to the residence of any of the defendants, and that in any such action, both at trial and on appeal, each Maker will pay all costs and expenses and such sum as the court may adjudge reasonable as attorney's fees.

¶74    The District Court pointed out that this is an unusual case in that, had Pruyn prevailed, he would have been entitled to his attorney's fees under Montana contract law, yet when Axmen prevailed, it was not entitled to attorney's fees because it was not a party to the promissory note. The court concluded that such a result is inequitable and that, under its equity powers, the court may award attorney's fees to make an injured party whole. *See Braach v. Graybeal*, 1999 MT 234, ¶ 9, 296 Mont. 138, 988 P.2d 761.

¶75    However, as Pruyn noted, the equitable exception has been invoked infrequently, and only in cases with particularly limited facts. The exception does not apply where the losing party had a reasonable basis to believe his cause might prevail. *See Goodover v. Lindey's Inc.*, 255 Mont. 430, 446-47, 843 P.2d 765, 775-76 (1993).

¶76    In this case, we conclude that whether or not Judge Deschamps agreed with Pruyn's position, there is no merit to the idea that Pruyn lacked a reasonable basis to

26

believe he could recover his money from Axmen. And, we disagree with Judge Deschamps' conclusion that Pruyn's action was "frivolous and perhaps even malicious."

¶77 Accordingly, we hold that the District Court abused its discretion in awarding Axmen its attorney's fees and we reverse on this issue. We remand this issue to the District Court for entry of an order vacating its award of attorney's fees to Axmen.

**Issue 5.**

¶78 *Were Pruyn's due process rights violated as a result of Axmen's ex parte communications with the District Court?*

¶79 Pruyn contends on appeal that when the billing records compiled by Axmen's attorneys were provided to Pruyn for review of the attorney's fees awarded, many of the entries redacted on the basis of attorney-client privilege demonstrated that Axmen's attorneys had engaged in multiple *ex parte* communications with the District Court, at least one of which involved substantive argument on the merits of this case.[5] Because Pruyn was not given notice or an opportunity to respond, he contends that these *ex parte* contacts violated his rights to due process.

¶80 The District Court had no time to respond to these allegations, however, because Pruyn did not file his "Notice of Filing Regarding Court Communications" detailing his complaints regarding the alleged *ex parte* communications until the day he filed his Amended Notice of Appeal. This Court generally will not address an issue which the district court had no opportunity to decide. *In re Marriage of Gerhart*, 2003 MT 292,

---

[5] Although a black marker was used to cross out certain entries, the reviewer was still able to read the entries through the black ink.

27

¶ 31, 318 Mont. 94, 78 P.3d 1219 (citing *Siefke v. Siefke,* 2000 MT 281, ¶ 25, 302 Mont. 167, 13 P.3d 937).

¶81 If Pruyn's counsel believed ethical violations occurred here, the proper action for counsel to take is to report any alleged violations by a judge of the Canons of Judicial Ethics to the Executive Secretary of the Judicial Standards Commission of the State of Montana, and to report any alleged violations by an attorney of the Montana Rules of Professional Conduct to the Office of Disciplinary Counsel.

¶82 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We concur:

/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice John Warner concurs.

¶83 I concur.

¶84 As far as Pruyn is concerned, it is irrelevant whether Axmen had conferred ostensible authority on Kimbrell. No matter what Kimbrell may have told him or showed him, Pruyn chose not to deal with Axmen and instead dealt only with Kimbrell as an individual. The Court is entirely correct that § 30-3-401, MCA, does not apply. It was

28

solely Pruyn's mistake to trust Kimbrell and not check with the Hansons to make sure they signed the note. Axmen simply was not involved in Kimbrell's deal with Pruyn.

¶85 I am willing to accept that Axmen, Inc., could have made a mistake and granted Kimbrell ostensible authority to deal with Powderhorn. This does not change the fact that the deal between Powderhorn and Kimbrell had nothing to do with Pruyn.

¶86 The long and the short of this case is that Pruyn made a serious mistake when he rejected Axmen as a debtor and loaned money to Kimbrell without taking security and without checking with the Hansons. It is not established in the record, but maybe Axmen also made a mistake and granted Kimbrell ostensible authority to deal with Powderhorn. However, Axmen's mistake does not translate into a conclusion that it has been unjustly enriched by Pruyn's carelessness. In my opinion, Pruyn's carelessness was far more egregious than any mistake Axmen might have made. However, at most, Pruyn and Axmen are equally at fault—and between those who are equally in the wrong, the law does not interpose. Section 1-3-215, MCA.

¶87 The District Court and this Court are correct in leaving these parties where it found them. I concur in the Court's opinion.

/S/ JOHN WARNER

Justice W. William Leaphart, dissenting.

¶88 I dissent on issues two and three. The Court has failed to apply both parts of the test for determining ostensible authority. The Court has analyzed only the second step:

29

"Part of the test to determine whether ostensible authority exists is to determine what a prudent person, acting in good faith, under the circumstances, would reasonably believe the authority to be." Opinion, ¶ 42. While it is true that *part* of the test is, indeed, a "prudent person" perspective, the Court fails to analyze the first part of this Court's long-established test for determining ostensible authority.

¶89 As we have held in *Butler*, *Audit Services*, and *Yanzick*: "The test is found in a determination of the exact extent to which the principal held the agent out or permitted him to hold himself out as authorized, *and* what a prudent person, acting in good faith, under the circumstances would reasonably believe the authority to be." *Butler Mfg. Co. v. J & L Imp. Co.*, 167 Mont. 519, 527, 540 P.2d 962, 969 (1975) (emphasis added); *Yanzick v. Bd. of Trustees*, 177 Mont. 459, 462-63, 582 P.2d 338, 340 (1978); *Audit Servs. v. Elmo Rd. Corp.*, 175 Mont. 533, 540, 575 P.2d 77, 81 (1978). Ostensible authority is "such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." *Butler Mfg. Co.*, 167 Mont. at 524, 540 P.2d at 965. Ostensible authority "can be implied from the words and conduct of the parties and the circumstances of the particular case notwithstanding a denial by the alleged principal." *Youderian Constr. v. Hall*, 285 Mont. 1, 7, 945 P.2d 909, 913 (1997) (citing *Audit Serv., Inc.*, 175 Mont. at 541, 575 P.2d at 81). Further, the agency relationship "may be implied from the conduct and from all the facts and circumstances in the case and it may be shown by circumstantial evidence." *Youderian*, 285 Mont. at 7, 945 P.2d at 912-13. As outlined below, both requirements for ostensible authority are met in this case. Axmen *is* liable.

30

¶90 The words, conduct, circumstances and facts of this case all indicate that Kimbrell was acting with ostensible authority on behalf of Axmen. Axmen's sole officers, directors and shareholders were Edward Kimbrell, Grant Hanson, and Guy Hanson. Axmen, by "want of ordinary care," had failed to monitor or set limits on Kimbrell's authority to act on behalf of the company. Kimbrell was Axmen's president and was vested with authority from the Hanson brothers to conduct day-to-day operations. Indeed, he was the *only* person in charge of daily operations at Axmen. Kimbrell was held out by the company to enter propane procurement contracts, which included both large and small amounts. No meetings, resolutions or authorization were ever required prerequisites of Kimbrell entering contracts on behalf of the company. It is difficult to understand how the Court can assert that Kimbrell was "not given authority to speculate in this fashion" when there is no indication that the corporation had ever established that there were limits to the scope of Kimbrell's authority in the first place. Opinion, ¶ 66.

¶91 The Court makes a strained distinction between what it describes as this "speculative" transaction and the other transactions Pruyn has engaged in on behalf of Axmen. Opinion, ¶ 66. The record shows that Axmen allowed Kimbrell to engage in both, and he did so without limitation or question from the corporation. In the course of his employment at Axmen, Kimbrell engaged in "hedging transactions," in which he would purchase large amounts of propane at a fixed price, then sell it to customers at a future date. The company never objected. In fact, Guy Hanson's testimony indicates that Axmen had no written policy, oversight, or internal controls establishing the scope of Kimbrell's purchasing and/or hedging authority. And it is not this Court's prerogative to

31

decide how much authority is too much authority. That is a decision Axmen should have made and enforced prior to what amounted to a financially deleterious outcome for the company.

¶92 Further, the majority of Kimbrell's actions as day-to-day business manager at Axmen were done on credit. Axmen admitted that Kimbrell was authorized to incur debt on behalf of Axmen. The corporation had no written policy articulating the scope of Kimbrell's borrowing authority. Therefore, the ex post facto claim that Kimbrell acted outside of his authority is untenable given that the company never articulated the scope of the authority it now claims has been overstepped.

¶93 There is no indication that if the prices had risen instead of dropped, that Axmen would have rejected the propane and large profits resulting from Kimbrell's dealings on behalf of Axmen. It was only when the company suffered a financial loss that the Hanson brothers suddenly claimed that Kimbrell acted outside the scope of his authority. This is the exact type of "want of ordinary care" on the part of Axmen that satisfies the first prong of the ostensible authority test. The existence of ostensible authority is simply not dependent on the success or failure of the agent's dealings on behalf of the company.

¶94 In determining whether Kimbrell was authorized to enter the transaction with Pruyn as a representative of Axmen, the Court focuses solely on the promissory note and the alleged individual liability it created. We have, however, made clear that the ostensible authority analysis is not a "four corners" inquiry. It is measured by the conduct, all the facts and circumstances in the case, and may be shown by circumstantial evidence. *Youderian*, 285 Mont. at 7, 945 P.2d at 912-13. Likewise, the Court

32

improperly focuses on the inability of Axmen to store the propane resulting from the transaction. Opinion, ¶ 52. Kimbrell had done this *type* of transaction in the past without objection from the corporation. Regardless, Axmen's ability to store the propane plays no part in the legal determination required under the two-part ostensible agency analysis. The germane fact here is that Axmen has a long track record of allowing Kimbrell to buy propane with no limits on his scope of authority.

¶95    The weight of responsibility under the first prong of the ostensible authority test lies not on Kimbrell's or Pruyn's shoulders, but on the shoulders of the corporation to exercise "ordinary care" in establishing the boundaries of its president's authority. Under the legal standard for ostensible authority, the corporation—not Pruyn—authored this misfortune by failing to establish the scope of their president's authority.

¶96    The Court next concludes that the second prong of the ostensible authority test is not satisfied. Opinion, ¶ 54. The assertion is not supported by any analysis under the "prudent person" standard. Instead, the Court states: "Pruyn himself was not convinced that Kimbrell had ostensible authority to bind Axmen to the note." Opinion, ¶ 54. This speculation about a party's thought process plays no role in the two-step analysis required by this Court's precedent on ostensible authority. The ostensible authority test does not ask the Court to divine whether Pruyn was convinced. It requires this Court to embark on a careful inquiry regarding "what a prudent person, acting in good faith, under the circumstances would reasonably believe the authority to be." *Butler Mfg. Co. v. J & L Imp. Co.*, 167 Mont. at 527, 540 P.2d at 969; *Yanzick v. Bd. of Trustees*, 177 Mont. at 462-63, 582 P.2d at 340.

33

¶97    This second prong of the ostensible authority test is satisfied. Kimbrell met with Pruyn several times to discuss the loan and details about the company. During the meetings, Kimbrell gave Pruyn information relating to *Axmen's* assets, *Axmen's* cash flow and *Axmen's* accounts receivable. Pruyn himself testified that based on the documentation from Axmen and his own investigation into the company's reputation and overall business prospects, he decided to lend Axmen $544,500. A prudent person in Pruyn's position would believe that Kimbrell had authority to act on behalf of Axmen: he was the company's president, ran day-to-day business operations, and appeared to have the authority to possess and share the company's private financial documents.

¶98    If the two men intended to draft a loan agreement based solely on individual liability, as the Court concludes, Kimbrell would not have provided or needed to provide Pruyn with information about the company's assets, cash flow and accounts receivable. He would have simply shown Pruyn his own personal financial documents. The same applies to the Hanson brothers. Only their personal documents would have been necessary, *not* the corporation's financial documents. It was Pruyn's understanding that the money was to be used by Axmen to buy a tract of land on which a large number of propane tanks were to be stored. The financial disclosures and stated purpose do not suggest a personal, individual propane storage project.

¶99    A prudent person under these circumstances would reasonably believe that Kimbrell, after providing and discussing the company's private financial documents, was acting on behalf of the company, not himself. Kimbrell had engaged in business transactions—whether they be hedging transactions or otherwise—for years on behalf of

the company without a word from the Hanson brothers. The facts, conduct, and circumstances clearly indicate that Axmen's "want of ordinary care" allowed Kimbrell to act, unbridled, on behalf of the corporation, and that a prudent person would have believed that Kimbrell was authorized to act on the company's behalf. Therefore, both of the required elements of the ostensible authority test are satisfied.

¶100 The Court analyzes this case under § 30-3-403(2), MCA. Opinion, ¶ 50. However, it is subsection one that directly applies. The statute reads as follows:

> If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be if the signature were on a simple contract. If the represented person is bound, the signature of the representative is the "authorized signature of the represented person" and the represented person is liable on the instrument, *whether or not identified in the instrument*.

Section 30-3-403(1), MCA (emphasis added). The presence of the Axmen name on the contract is simply not necessary for the company to be held liable. Kimbrell, acting as a representative of Axmen, signed his name ("the signer"). Under the statute, Axmen (the "represented") is bound by the signature, regardless of whether Axmen was identified in the instrument. Section 30-3-403(1), MCA. Kimbrell, via ostensible authority, signed as an authorized representative of the corporation, thus making Axmen liable.

¶101 Issue three addresses the unjust enrichment claim. The doctrine of unjust enrichment is an equitable means of preventing one party from benefitting from his or her wrongful acts and requires a showing of misconduct, fault or that one party took advantage of the other. *LeFeber v. Johnson*, 2009 MT 188, ¶ 26, 351 Mont. 75, 81, 209

35

P.3d 254, 260; *Albinger v. Harris*, 2002 MT 118, ¶ 21, 310 Mont. 27, 33, 48 P.3d 711, 716; *Randolf v. Peterson, Inc. v. J.R. Simplot Co.*, 239 Mont. 1, 8, 778 P.2d 879, 883 (1989).

¶102   Kimbrell, with ostensible authority from the corporation, borrowed money from Pruyn.   The record shows that the money was wired to the *Axmen Propane* account at Powder Horn.   Kimbrell is the only person who signed the wire transfer form.[1]   The "Originator's Name" space reads: "Axmen Propane, Inc.—Reference."   The "Originator's Address" is filled in with the business address of Axmen Propane.   While "Pruyn Ranch" is written in a blank space at the top of the page, the wire is signed by Edward Kimbrell, Axmen's president.   The critical fact here, however, is that the money was received by Powder Horn, credited to Axmen Propane's account, and paid off the propane futures loss for Axmen Propane.   The company unjustly benefited from the acts of its president.   This scenario goes to the heart of unjust enrichment, in which the goal is to identify and ameliorate a breed of misconduct in which one party unjustly benefits from its own actions.

¶103   The Court bases its conclusion on the observation that the Hanson brothers were unaware of Kimbrell's purchase and the loan.   However, under this Court's test for ostensible authority, it is clear that the brothers granted Kimbrell the authority to engage in business on the corporation's behalf.   Therefore, the focus of the analysis should not be

---

[1] The Court refers to another document, titled "Wire/Fund Transfer Payment Order."  The form we reference and the payment order reflect the same transaction.  There is no indication in the record regarding the precise interaction or relative weight the two forms should be granted. Regardless, both documents reflect the reality that the money was used to pay off the Power Horn Petroleum debt.

on the brothers' alleged ignorance, but rather on the misconduct of the company through Kimbrell's ostensible authority. Axmen directly benefited from the misconduct of the corporation through its president, who illegitimately borrowed from Pruyn and applied the proceeds of the loan to pay off Axmen's debt to Powderhorn. Unjust enrichment therefore applies.

¶104 For the above reasons, I would reverse the District Court's summary judgment ruling on Pruyn's contract and unjust enrichment claims.


/S/ W. WILLIAM LEAPHART


Chief Justice Mike McGrath joins in the dissenting Opinion of Justice W. William Leaphart.


/S/ MIKE McGRATH